**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HEATHER MIZRACHI, | : |
| Plaintiff, | : CIVIL ACTION NO.: |
| vs. | : |
| THE SCHOOL DISTRICT OF PHILADELPHIA, | : **JURY TRIAL DEMANDED** |
| Defendant. | : |

## CIVIL ACTION COMPLAINT

Plaintiff, Heather Mizrachi, EdD ("Dr. Mizrachi"), by and through her undersigned counsel, Royer Cooper Cohen Braunfeld LLC, hereby files this Civil Action Complaint against Defendant, the School District of Philadelphia (the "School District"), and avers as follows:

## INTRODUCTION

1. Since the tragic and horrific events of October 7, 2023, Dr. Mizrachi, a long-tenured School District employee, has been subjected to a hostile work environment on the basis of both her religion and national origin.[1]

2. Dr. Mizrachi, who is Jewish and of Israeli ancestry[2] with family members currently living in the State of Israel, has been forced to endure conditions that, by any objective measure, are grossly offensive, severe, and pervasive, including, among many other things, being forced to look at images that advocate for the violent destruction of the Jewish people and the State of Israel.

3. Those images have been prominently displayed in the School District's central office

---

[1] Effective December 18, 2024, the School District reached a settlement with the United States Department of Education Office of Civil Rights (the "OCR") to address a complaint filed against the School District for discriminating against students on the basis of national origin (shared Jewish ancestry), including by failing to respond to incidents of harassment during the 2023-2024 school year (the "OCR Complaint"). *See* https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/03241286-a.pdf.

[2] Dr. Mizrachi's father is Israeli, and Dr. Mizrachi openly embraces her identify as a Jewish person of Israeli lineage.

located at 440 N. Broad Street, Philadelphia, PA 19130 (the "Central Office"), where Dr. Mizrachi is based and required to perform her job duties each day.

4. Just for example, on December 9, 2024, as she was making her way through a main corridor of the Central Office, which she needs to traverse in order to get to her assigned workstation, Dr. Mizrachi encountered the following, conspicuously displayed poster (the "Poster"):



5. The Poster was placed and displayed in a main corridor of the Central Office by other School District employee(s) and left there to be seen by all employees who work in the Central Office, including Dr. Mizrachi.

6. In looking at the Poster, it is critical to understand what each of its various pieces represent, especially to a Jewish person of Israeli ancestry, like Dr. Mizrachi.

7. First, with respect to the phrase "***FROM THE RIVER TO THE SEA***," as explained by the Anti-Defamation League ("ADL"):

> This rallying cry has long been used by anti-Israel voices, including supporters of terrorist organizations such as Hamas and the PFLP, *which seek Israel's destruction through violent means*. It is fundamentally a call for a Palestinian state extending from the Jordan River to the Mediterranean Sea, territory that includes the State of Israel, *which would mean the dismantling of the Jewish state. It is an antisemitic charge denying the Jewish right to self-determination, including through the removal of Jews from their ancestral homeland.*
>
> *Usage of this phrase has the effect of making members of the Jewish and pro-Israel community feel unsafe and ostracized*. It is important to note that demanding justice for Palestinians, or calling for a Palestinian state, should not mean, as *this hateful phrase posits*, denying the right of the State of Israel to exist.[3]

8. Indeed, as resolved by the U.S. House of Representatives via H. Res. 883, "the slogan 'from the river to the sea, Palestine will be free' *is an antisemitic call to arms with the goal of the eradication of the State of Israel, which is located between the Jordan River and the Mediterranean Sea*" and, moreover:

(1) the slogan, 'from the river to the sea, Palestine will be free', is outrightly antisemitic and must be strongly condemned;

(2) this slogan is divisive and does a disservice to Israelis, Palestinians, and all those in the region who seek peace;

(3) this slogan rejects calls for peace, stability, and safety in the region;

(4) *this slogan perpetuates hatred against the State of Israel and the Jewish people; and*

(5) *anyone who calls for the eradication of Israel and the Jewish people are antisemitic and must always be condemned.*[4]

9. Second, with respect to red painted handprints located at the top of the Poster, they are a well-known symbol of the notorious "Ramallah Lynching" of 2000, during which two Israelis were killed via beatings and stabbings and a photograph was captured of one of the killers holding

---

[3] *See* https://www.adl.org/resources/backgrounder/slogan-river-sea-palestine-will-be-free (emphasis added).

[4] *See* https://www.congress.gov/bill/118th-congress/house-resolution/883/text (emphasis added). In addition, for the purpose of defining "antisemitism," *see* https://holocaustremembrance.com/resources/working-definition-antisemitism.

up his red bloodstained hands to a cheering crowd.

10. In other words, both the phrase "***FROM THE RIVER TO THE SEA***" and the red painted handprints on the Poster that was displayed prominently in the Central Office are used to intimidate and advocate for violence against Jewish and Israeli people, including Dr. Mizrachi – just like the ADL has explained and the U.S. House of Representatives has formally resolved.

11. While Dr. Mizrachi is a strong proponent of freedom of speech, **no employee** should be confronted with and forced to look at such images **in the workplace**, and by having forced her to do so, the School District fundamentally altered the conditions of Dr. Mizrachi's employment there.

12. Indeed, without anything more, being forced to look at such hateful images while trying to perform one's job duties gives rise to severe mistreatment on the basis of Dr. Mizrachi's religion and national origin.[5]

13. But that is not all.

14. Despite her many, many complaints and pleas for help, the School District failed to remedy the situation in any meaningful way, choosing instead to ignore Dr. Mizrachi and allow the hostile work environment to persist.

15. Accordingly, Dr. Mizrachi is left with no choice but to initiate this action to redress the School District's violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").

## THE PARTIES

16. Dr. Mizrachi is a Jewish adult of Israeli ancestry and a resident of New Jersey.

17. The School District is a political subdivision and public entity that is responsible for

---

[5] As explained by the U.S. Equal Employment Opportunity Commission ("EEOC"), "a single incident can create a hostile work environment if it is sufficiently severe, such as the display of certain symbols of violence or hatred (e.g., a swastika) toward individuals sharing the same protected characteristic." In addition, and as will be relevant below, "[c]onduct that occurs outside of work can contribute to a hostile work environment. For example, if an employee posts religious slurs about a Muslim or Jewish coworker on their personal social media, it can affect the workplace if the coworker learns about the posts directly, or other coworkers see and discuss them at work." *See* https://www.eeoc.gov/anti-arab-anti-middle-eastern-anti-muslim-and-antisemitic-discrimination-are-illegal.

the administration and governance of public education within the City of Philadelphia.

18. The School District serves a very diverse student population and is the largest public school district in the Commonwealth of Pennsylvania and one of the largest in the United States.

19. The School District employs administrators, teaches, and staff who oversee the educational and administration functions of its schools.

20. The School District's principal place of business is the Central Office, which, as noted above, is located at 440 N. Broad Street, Philadelphia, PA 19130.

21. At all times material to this action, the School District acted by and through its authorized agents, servants, contractors, or employees acting within the course and scope of their employment with the School District and in furtherance of the School District's mission, business, and affairs.

22. At all times material to this action, the School District employed more than 500 employees.

23. At all times material to this action, the School District was an "employer" within the meaning of Title VII.

24. At all times material to this action, Dr. Mizrachi was an "employee" of the School District within the meaning of Title VII.

## JURISDICTION AND VENUE

25. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because each of Dr. Mizrachi's claims arise under Title VII.

26. The School District is subject to the personal jurisdiction of this Court.

27. Venue is proper in the District Court under 28 U.S.C. §1391(b) because the School District's principal place of business is located within this District, and all or a substantial part of the events and occurrences giving rise to Dr. Mizrachi's claims occurred within this District.

28. Venue as to Dr. Mizrachi's Title VII claims is also proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices were committed within this District and employment records relevant to those practices are maintained and administered here.

## COMPLIANCE WITH ADMINISTRATIVE REQUIREMENTS

29. On December 14, 2024, Dr. Mizrachi filed a Charge of Discrimination with the EEOC, complaining of the acts of discrimination alleged herein.

30. On February 26, 2025, the EEOC issued a Determination and Notice of Rights to Dr. Mizrachi ("Right to Sue Letter"), and Dr. Mizrachi has initiated this action within ninety (90) days of her receiving the Right to Sue Letter.

31. Accordingly, Dr. Mizrachi has complied with all administrative prerequisites to commencing this action under Title VII.[6]

## FACTS SUPPORTING CLAIMS

### A. Dr. Mizrachi's Credentials and Tenure with the School District

32. In 1999, Dr. Mizrachi obtained her Bachelor's degree from Temple University.

33. In 2011, Dr. Mizrachi obtained her Master of Education degree from Arcadia University, and in 2019, Dr. Mizrachi obtained a Doctor of Education degree from Drexel University.

34. For more than fourteen (14) years, Dr. Mizrachi has dedicated her career to educating the youth and ensuring that they have what they need to prosper.

35. Dr. Mizrachi has been employed by the School District since 2017.

36. For the last four (4) years of her employment, Dr. Mizrachi has held the position of Curriculum Specialist (6-8), focusing on Multilingual Curriculum & Programs.

37. In her role as a Curriculum Specialist, Dr. Mizrachi is based in the Central Office

---

[6] Along with this Complaint, Dr. Mizrachi will file a separate Complaint with the Pennsylvania Human Relations Commission ("PHRC"). Once Dr. Mizrachi has exhausted her administrative remedies with the PHRC, she intends to assert additional causes of action under the Pennsylvania Human Relations Act ("PHRA").

and is required to perform her day-to-day job duties there, where the School District's administration, including its highest-ranking officials, are based (collectively, the "Administration").

38. At all times during her employment with the School District, Dr. Mizrachi has been an exemplary employee and has not received any negative performance reviews.

### B. The Hostile Work Environment and Dr. Mizrachi's Unanswered Complaints

39. As noted above, following October 7, 2023, there was a drastic upsurge in instances of antisemitic behavior and conduct across the School District, which had a substantially adverse impact on those of Jewish and Israeli lineage, as detailed at length in the OCR Complaint that was filed against the School District and later resolved on December 18, 2024.

40. That rise in antisemitic behavior and conduct permeated through the School District, including in ways that directly impacted School District employees who perform their job duties in the Central Office, like Dr. Mizrachi.

41. For example, in the weeks and months that followed October 7, 2023, numerous School District employees, including employees who work at the Central Office and in very close physical proximity to Dr. Mizrachi, began making social media posts calling for the destruction of the State of Israel and the Jewish people (collectively, "Social Media Posts").

42. Many of the Social Media Posts used the same phrase set forth on the Poster that was conspicuously displayed in the Central Office – *"FROM THE RIVER TO THE SEA"* – and they also equated Jewish and Israeli people to white supremacists, referred to Israel as a "terrorist state" that should not exist, and cheered on the violent attacks that Hamas carried out on October 7, 2023.

43. The Social Media Posts may have been made by School District employees using their personal social media accounts, but: (i) the same School District employees frequently utilize those same social media accounts to make work-related announcements, including as it relates to School District conferences, curricula, and programs; (ii) the Social Media Posts were circulated

among School District employees who work in the Central Office, including to Dr. Mizrachi.

44. As a result, in the weeks and months following October 7, 2023, Dr. Mizrachi was subjected to looking at Social Media Posts from other School District employees, which, just like the Poster, make "members of the Jewish and pro-Israel community feel unsafe and ostracized" (as explained by the ADL and formally resolved by the U.S. House of Representatives).

45. In addition to the Social Media Posts, written materials were being implemented and used by the School District's Board of Education (the "Board Policy 248 Materials"), which included language such as *"Drew the dirty Jew"* and *"Give me your money Jew, I know you have some."*

46. On October 9, 2023, Dr. Mizrachi submitted a formal written complaint to the School District's Office of the Board of Education about the Board Policy 248 Materials and requested that the offensive references to Jewish people be removed, as they were highly-offensive and completely unnecessary to accomplish the Board or Education's stated desire to provide training to employees.

47. Despite her following up multiple times in writing, the School District took no action to address Dr. Mizrachi's concerns for more than a year until the Board Policy 248 Materials were updated effective as of February 27, 2025 (although the original versions, which include the highly-offensive language, are still available to School District employees).

48. Throughout December 2023 and January 2024, Dr. Mizrachi submitted multiple written complaints to the School District regarding the Social Media Posts, as well as School District employees engaging in other displays of antisemitism.

49. Those complaints were to no avail.

50. On February 29, 2024, Dr. Mizrachi met with Michelle Chapman ("Chapman"), the School District's Deputy Chief of Employee Relations, in order to further address the Social Media Posts, the Board Policy 248 Materials, and other instances of antisemitism in the workplace.

51. Chapman acknowledged that such issues exist, but told Dr. Mizrachi that there was

nothing that she could do other than take notes and share them with the Administration.

52. Dr. Mizrachi thanked Chapman for saying that she would "take notes" to ensure that antisemitism has no place in the School District's workplace.

53. In response, Chapman said *"No, hold on a minute, don't quote me on that. I did not say that antisemitism is not okay."*

54. Dr. Mizrachi immediately asked if Chapman knew what she had just said – i.e., *"I did not say that antisemitism is not okay"* – and Chapman replied *"I know what I said."*

55. Taken aback by Chapman's retort, Dr. Mizrachi began crying in front of Chapman and Dr. Mizrachi's colleague, who was also present for the meeting and made similar complaints, informed Chapman that she felt *"dehumanized."*

56. The February 29, 2024 meeting ended without any resolution to the issues that Dr. Mizrachi and her colleague complained about, and instead, the Social Media Posts continued to be made and the acts of antisemitism continued to permeate the workplace.

57. After speaking with the president of her union to request guidance, Dr. Mizrachi reached out to Jeremy Grant-Skinner ("Grant-Skinner"), the School District's Deputy Superintendent of Talent, Strategy, and Culture, who was Chapman's supervisor at the time.

58. On March 13 2024, Dr. Mizrachi spoke with Grant-Skinner.

59. Acknowledging that Chapman's prior statement was wrong, Grant-Skinner told Dr. Mizrachi "of course, antisemitism is not okay" and represented that he would look into situation.

60. However, shortly after that March 13, 2024 telephone call, Grant-Skinner resigned from the School District, leaving Dr. Mizrachi without any resolution to her complaints and to continue navigating a workplace in which she was exposed to behavior, conduct, and Administration-driven initiatives that were highly-offensive to her as a Jewish person of Israeli ancestry.

61. For instance, on August 13, 2024, the School District conducted an orientation for

new hires (the "New Hire Orientation"), which Dr. Mizrachi was required to attend.

62. At the New Hire Orientation, a School District employee was wearing a t-shirt that said *"Palestine,"* but with the *"i"* in the word Palestine in the shape of the State of Israel (the "T-Shirt") – meaning that the State of Israel should not exist and Palestine should take its place.

63. Once again, Dr. Mizrachi fully supports freedom of speech, but such images should not be displayed in the workplace, where Jewish employees of Israeli ancestry are forced to look at them and then expected to just go about their day and perform their work as if nothing ever happened.

64. As with the language and images displayed on the Poster in the Central Office, the message conveyed by the T-Shirt is one that supports the destruction of Dr. Mizrachi's people and family members, including family members, who at that exact time, were huddling in bomb shelters because they were under rocket fire in Haifa, Israel.

65. Upon being faced with the T-Shirt, Dr. Mizrachi sent an e-mail to Meredith Mehra ("Mehra"), the School District's Deputy Chief in charge of the New Hire Orientation, to complain about the T-Shirt and ask for Mehra's assistance to remedy the situation.

66. Mehra failed to take any action and told Dr. Mizrachi that it was "unnecessary" to confront the School District employee who was wearing the T-Shirt.

67. When Dr. Mizrachi asked Mehra to escalate the situation to the School District's human resources department, Mehra refused and told Dr. Mizrachi that she could excuse herself from the New Hire Orientation – which Dr. Mizrachi worked to co-facilitate – instead of doing anything to stop the other School District employee from wearing the T-Shirt in the workplace.

68. Dr. Mizrachi went on to tell Mehra that the School District is *"supposed to be a safe place for all, but I guess that means everyone except people like me"* (i.e., Jewish employees of Israeli ancestry).

69. Mehra shrugged her shoulders as Dr. Mizrachi walked back to her session (crying).

70. On September 24, 2024, Dr. Mizrachi submitted another formal written complaint; this time directly to the School District's Office of Employee & Labor Relations.

71. Dr. Mizrachi informed the Office of Employee & Labor Relations, *inter alia*, that on that same date, another School District Employee was wearing a Palestine pendant in the shape of the State Israel (the "Pendant") during a professional development day.

72. Similarly to the T-Shirt, the Pendant is an image that calls for the State of Israel to no longer exist, and one that should not be displayed in the workplace for Jewish employees of Israeli ancestry (like Dr. Mizrachi) to encounter.

73. As with Dr. Mizrachi's prior complaints, the School District did nothing, and instead, informed Dr. Mizrachi that her complaint did *"not rise to the level of harassment or discrimination"* and that the Office of Employee & Labor Relations would *"not take further action and [would] consider th[e] matter closed."*

74. On October 1, 2024, the School District conducted an "Antisemitism/Islamophobia" training (the "October 1st Training"), which Central Office employees (including Dr. Mizrachi) attended.

75. At the October 1st Training, in addition to the presenters (who were approved by the Administration) making comments about how the State of Israel's right to exist is questionable, the School District's DEI Office's Deputy Chief, Sabriya Jubillee ("Jubillee"), made a closing statement, during which Jubillee called out the one Jewish presenter who shared their personal experiences and remarked *"…some people would say that having a divine right to land doesn't give you the right to do certain things…"*

76. In other words, during a formal training session conducted by the Administration for all Central Office employees (including Dr. Mizrachi), the School District's own DEI Office's Deputy Chief stood up, called out the one Jewish presenter, and questioned the State of Israel's right

to exist in front of everyone who was in attendance.

77. As a Jewish employee of Israeli ancestry with family members living (and then under attack) in the State of Israel, naturally, Dr. Mizrachi was deeply troubled and offended by Jubillee's remarks at the October 1st Training.

78. Again, such remarks have no place in the workplace.

79. After the October 1st Training, Dr. Mizrachi reached out to Jubillee's supervisor, the School District's Chief Operating Officer, Oz Hill ("Hill"), on two (2) separate occasions via e-mail in order to lodge complaints about Jubillee's troubling remarks.

80. Hill never replied to Dr. Mizrachi's e-mails.

81. Rather, despite Dr. Mizrachi's complaints and e-mails to Hill, on January 22, 2025, the School District repeated the October 1st Training via another session, during which a presenter who was brought in by the School District displayed a map of the Middle East with "Palestine" typed where the State of Israel is located, suggesting that the State of Israel should not / does not exist.

82. On October 29, 2024, Dr. Mizrachi made yet another complaint to the School District regarding another employee who continued to make Social Media Posts, which, as before, were made alongside posts about School District affairs and sought to equate Jewish and Israeli people to white supremacists and called into question the State of Israel's right to exist.

83. Once again, the School District failed to take any remedial action, and the antisemitic behavior and conduct to which Dr. Mizrachi was exposed persisted.

84. Then, on December 9, 2024, as she was walking through a main corridor of the Central Office to get to her workstation for the day, Dr. Mizrachi came upon the Poster.

85. By that time, Dr. Mizrachi had already endured months and months of antisemitism without any meaningful assistance from the School District (and despite her many pleas for help).

86. After such a long period of time enduring the conditions to which she was subjected,

being forced to look at the Poster **in the workplace** was extremely upsetting and troubling to Dr. Mizrachi, and like the ADL and the U.S. House of Representatives have declared, caused her to feel unsafe and ostracized in a place where she should feel safe and able to perform her job duties without encountering images and words that call for the violent destruction of her people – Jews and Israelis.

87. Further, based upon the numerous complaints that Dr. Mizrachi made before she was faced with the Poster on December 9, 2024, the School District should have taken necessary steps to ensure that such images could and would not be displayed in the Central Office, including by, for example, implementing policies that prohibit such images from being displayed in the workplace.

88. The School District failed to do so, and to the extent the School District may say that such policies were already in place, they were not properly enforced to prevent the harm.

89. And it was not just one Poster that Dr. Mizrachi encountered in the Central Office.

90. Also in December 2024, there was another display present in the same main corridor of the Central Office, which likewise included the phrase *"**FROM THE RIVER TO THE SEA**."*

91. As a result of being forced to look at such hateful images in the workplace, alone, and certainly when taken together with the other mistreatment that she was forced to endure for months and months following October 7, 2023 – without any meaningful remediation from the School District – Dr. Mizrachi was subjected to severe and/or pervasive discriminatory conduct on the basis of her religion and national origin, which she now seeks to redress through this action.

### COUNT I – TITLE VII
**(Hostile Work Environment – Religion)**
*Dr. Mizrachi v. the School District*

92. Dr. Mizrachi incorporates the foregoing allegations of this Complaint as if set forth herein in their entirety.

93. The discriminatory conduct of the School District based upon Dr. Mizrachi's religion (Jewish), as alleged herein, was severe and/or pervasive enough to make a reasonable person believe

that the conditions of employment had been altered and that a hostile work environment existed, and made Dr. Mizrachi believe that the conditions of employment had been altered and that a hostile work environment existed.

94. By subjecting Dr. Mizrachi to a hostile work environment based on her religion, the School District violated Title VII.

95. As a direct and proximate result of the School District's violations of Title VII, Dr. Mizrachi has suffered, does suffer, and will suffer harm and injury in the form of emotional pain, mental anguish, fear, stress, anxiety, depression, embarrassment and humiliation, inconvenience, and loss of enjoyment of life.

96. As a further direct and proximate result of the School Districts' violations of Title VII, Dr. Mizrachi has received, is receiving, and will in the future receive treatment and therapy for mental anguish.

97. Dr. Mizrachi is entitled to declaratory relief that the School District violated her rights under Title VII, as well as equitable relief enjoining the School District from committing further acts in violation of Title VII.

98. As a further direct and proximate result of the School District's violation of Title VII, Dr. Mizrachi has incurred and will incur attorneys' fees and costs.

99. In violating Title VII, as set forth above, the School District acted with malice and/or reckless indifference to Dr. Mizrachi's rights, thereby entitling Dr. Mizrachi to punitive damages.

### COUNT II – TITLE VII
**(Hostile Work Environment – National Origin)**
*Dr. Mizrachi v. the School District*

100. Dr. Mizrachi incorporates the foregoing allegations of this Complaint as if set forth herein in their entirety.

101. The discriminatory conduct of the School District based upon Dr. Mizrachi's

national origin (Israeli ancestry), as alleged herein, was severe and/or pervasive enough to make a reasonable person believe that the conditions of employment had been altered and that a hostile work environment existed, and made Dr. Mizrachi believe that the conditions of employment had been altered and that a hostile work environment existed.

102. By subjecting Dr. Mizrachi to a hostile work environment based on her national origin, the School District violated Title VII.

103. As a direct and proximate result of the School District's violations of Title VII, Dr. Mizrachi has suffered, does suffer, and will suffer harm and injury in the form of emotional pain, mental anguish, fear, stress, anxiety, depression, embarrassment and humiliation, inconvenience, and loss of enjoyment of life.

104. As a further direct and proximate result of the School Districts' violations of Title VII, Dr. Mizrachi has received, is receiving, and will in the future receive treatment and therapy for mental anguish.

105. Dr. Mizrachi is entitled to declaratory relief that the School District violated her rights under Title VII, as well as equitable relief enjoining the School District from committing further acts in violation of Title VII.

106. As a further direct and proximate result of the School District's violation of Title VII, Dr. Mizrachi has incurred and will incur attorneys' fees and costs.

107. In violating Title VII, as set forth above, the School District acted with malice and/or reckless indifference to Dr. Mizrachi's rights, thereby entitling Dr. Mizrachi to punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Dr. Mizrachi seeks damages and legal and equitable relief in connection with the School District's unlawful conduct, and specifically prays that this Court grant her the following relief by:

(a) declaring the acts and practices complained of herein to be in violation of Title VII;

(b) enjoining and permanently restraining the violations alleged herein;

(c) entering judgment against the School District and in favor of Dr. Mizrachi in an amount to be determined;

(d) awarding compensatory damages to Dr. Mizrachi for past and future pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, which Dr. Mizrachi has suffered or may suffer as a result of the School District's unlawful conduct;

(e) awarding punitive damages against the School District under Title VII;

(f) awarding Dr. Mizrachi any other damages that are appropriate under Title VII;

(g) awarding Dr. Mizrachi the costs of suit, expert fees and other disbursements, and reasonable attorneys' fees; and

(h) granting any other relief that this Court may deem just, proper, or equitable including other equitable and injunctive relief providing restitution for past violations and preventing future violations.

## JURY TRIAL DEMAND

Dr. Mizrachi demands a trial by jury on all issues so triable.

Respectfully Submitted,

**ROYER COOPER COHEN BRAUNFELD LLC**

Dated: April 1, 2025      By:    */s/ Marc B. Cytryn*
**Marc B. Cytryn, Esq. (No. 320958)**
101 West Elm Street
Suite 400
Conshohocken, PA 19428
267-546-0210 (phone)
484-362-2630 (facsimile)
mcytryn@rccblaw.com
*Attorneys for Plaintiff, Heather Mizrachi, EdD*